## Broughton v. Northwest Natural Gas Co.

*William L. Walker,* for plaintiffs.

*Harold J. Bender,* for defendant Northwest Natural Gas Co.

*James M. Lemieux,* for additional defendant/intervenors.

THOMAS, *P.J.,* December 6, 1988—

## ISSUES

We are called upon to determine what interest plaintiffs Broughton have in two gas wells drilled on additional defendant Hatchers' property. The wells were drilled and managed by Northwest for a group of 25 or 30 investors. Northwest raises the issue of laches against Broughtons and files a cross-claim against Hatchers for breach of warranty or title. In summary, we must determine if Broughtons have any interest in the wells and, if so, the nature and amount of their interest. In the event of a verdict in favor of Broughtons, we must determine whether said interest should be taken from Hatchers' one-eighth royalty interest or from Northwest's interest. We must also consider that if Northwest is responsible to compensate Broughtons for their interest whether Northwest should be permitted to recover their loss from Hatchers under a warranty-of-title clause contained in the gas lease from Hatchers to Northwest.

We note initially that the parties and the court are again plagued by the ancient case of *Dunham and*

228

*Shortt v. Kirkpatrick,* 101 Pa. 36 (1882), when in 1882 the Supreme Court of Pennsylvania concluded that a reservation of "all minerals" in an agreement or deed did not include a reservation of petroleum rights. *Dunham* and its progeny extended this unique Pennsylvania theory to include both oil and gas. Subsequent court interpretations have established this peculiar Pennsylvania presumption to be a rebuttable one. We note that this anachronistic presumption has come before the courts of this county in recent decades for interpretation. We presume that other counties where oil and gas drillings have sprung into existence after about 1950 have been plagued with the *"Dunham* problem" when drafting attorneys or individuals entering into agreements, leases or conveyances which reserved mineral rights were not aware of the *Dunham* decision and proceeded under the nearly universal assumption that a reservation of mineral rights *included* reservation of oil and gas interest in the land.

We note that Edith M. Hatcher's interest in this action has passed to her son Roger and all parties agree she has no interests to be adjudicated in this lawsuit.

## CHRONOLOGICAL NARRATIVE

The genesis of the present problem began in 1964 when Broughtons conveyed the real estate at issue to Sheltons and reserved to themselves, and their heirs and assigns "an undivided one-half of all mineral rights in the above-described land." At the time of the 1964 conveyance the land was already subject to an oil and gas lease to Earl Linn or his assignees, which had the usual provision reserving unto the lessors a one-eighth overriding royalty on

all gas in production and the right for free gas from any well for home use. This lease was subsequently renewed by Broughtons and Sheltons for an additional five years, but expired in 1974 because no drilling had been done. In 1976, Sheltons conveyed the land to Hatchers, and in 1980 Hatchers entered into a new oil and gas lease with Northwest with the usual one-eighth reserve royalty. Drilling commenced shortly after the signing of the lease and two moderately successful gas wells went into production. The cost of the two wells to Northwest and its investors amounted to some $271,000. Roger and Caroline Hatcher are divorced and each Hatcher ended up with one of the wells.

Three or four months after drilling and about the time the wells were coming into successful gas production, Broughtons learned of the drilling, contacted Northwest and inquired what they were going to do about Broughtons' 1964 reservation of one-half of the mineral rights.

When Hatchers purchased the property their title-searching attorney apparently overlooked the Broughton mineral-rights reservation. However, before Northwest drilled, it procured a title search which disclosed Broughtons' reservation. Northwest then conferred with potential investors and their own attorney, and decided to drill without contacting Broughtons. Hindsight shows this was an unwise decision, but in explanation thereof the president of Northwest postulated that they relied on the *Dunham* decision, recognizing it as an unrebuttable presumption rather than a rebuttable presumption. Further, the president of Northwest testified that at the time the drilling decision was made, Hatchers had been made aware of the "Broughton reservation" problem, and were told the title "snag" would require Northwest to escrow

some of the royalty payments. However, Northwest chose not to contact Broughtons about the title "snag" as it "might have raised more problems than it solved."[*]

As a precautionary measure, as the one-eighth gas production royalties became payable to Hatchers, Northwest paid only one-half of the same to Hatchers and placed the other one-half(i.e. one-sixteenth) in an escrow account at interest for future disposition when Broughtons' interest was determined.

Determining whether Broughtons had an interest depends on the application of *Dunham,* and we have no hesitancy in this case in finding from the facts that it was Broughtons' (and Sheltons') original intent that the reservation of "minerals" included gas and oil rights. Finding case law or legal precedent to ascertain the extent of Broughtons' reserved interest under the peculiar facts of this case is difficult and calls upon the court to apply equitable principles.

## DISCUSSION

The testimony clearly shows that when Broughtons sold to Sheltons, those parties both agreed that had the original lease with Linn and its renewal produced a successful well, the one-eighth royalty reserved in the Linn lease would have been divided equally between Broughtons and Sheltons.

Broughtons' present posture is that given the expiration of the original Linn lease, the failure of notice from Northwest before drilling makes them a partner in some undetermined proportion with

---

[*] This language from the court's notes, as no transcript of the testimony is available at this time.

Northwest in these two wells. Both Mr. and Mrs. Broughton were permitted to opine as to their theory of what their present interest is. Mrs. Broughton seemingly contends that she felt their interest was one-half of the present Hatcher one-eighth override royalty. However, Mr. Broughton testified that he felt they were entitled to one-half of the net profit derived from the two wells. Mr. Broughton stressed the fact that *had* Northwest contacted him when they learned of his mineral rights reservation, he should have been accorded the opportunity to invest as a partner in the drilling operation. When asked what his share of the partnership would have been and what his obligation would have been had the wells turned out to be "dry holes," Broughton only postulated that it would have depended on the terms of the partnership agreement he *would have* entered into with Northwest and its numerous investors. Broughton feels rightfully indignant over the fact that he was never contacted in advance of drilling, in spite of the fact their real or potential interest in half the mineral rights was known to Northwest, and feels this oversight on Northwest's part is now deserving of allocating to him one-half of the net profits from these wells.

While we sympathize with Broughton's indignation over what he considers the cavalier handling of reserved mineral rights by Northwest, we cannot visualize that equity should bestow upon him a windfall profit because of an arguable decision made by Northwest. It is obvious that no driller in his right mind would assume the risk for himself or his investors of providing the capital ($271,000) to drill these wells, knowing that Broughton would assume none of the capital obligations and would still receive one-half of the new profits. Likewise, we have no way of ascertaining whether eight years

ago Broughtons were in a financial position to invest risk capital in such an enterprise.

We feel Broughtons are entitled to fair compensation under all the peculiar circumstances of this case, but to try and belatedly make them some type of a partner in this drilling project is a totally impractical solution. We determine that an appropriate award to Broughtons to compensate for their reserved mineral rights would be one-half of the standard one-eighth royalty.

This resolution then brings us face to face with the Hatcher problem and the cross-claim of Northwest against Hatchers for breach of warranty. As previously noted, when Hatchers purchased the property they secured the services of an attorney who gave them the usual title certificate, but apparently overlooked the mineral reservation rights. Thus, Hatchers signed the lease with Northwest providing for a one-eighth royalty on the assumption that they would be receiving the total one-eighth royalty due under the lease. While it might be easy to postulate that if we awarded the one-sixteenth royalty held in escrow to Broughtons and allocated the remaining one-sixteenth already reserved to Hatchers, Hatchers would still have a theoretical recourse to collect on their loss of the other one-sixteenth by a suit against the title-searching attorney. If we adopted this approach we would simply be inviting Hatchers to commence another lawsuit to collect their damages. In this regard, we cannnot construe the warranty language in paragraph 6 of the lease as the absolute guarantee of title that Northwest postulates. Furthermore, we cannot conceive that an experienced drilling company like Northwest relied on this warranty and the unknown financial solvency of the Hatchers as being a substantial element in their decision to

overlook Broughtons' reserved mineral rights. Northwest knew before drilling of the "Broughton problem" and any reliance on the standard "warranty clause" in Hatchers' lease was foolhardy. With the amount of capital and income involved in this enterprise, Northwest's decision not to contact Broughtons and to rely on Hatchers making them whole under the Hatchers lease "warranty" was unrealistic. Before drilling Northwest knew they had a potential problem with the "Broughton mineral rights reservation." The testimony indicates that Northwest's practice was to enter into oil and gas leases (here Hatcher) without having a title search done. But once a decision to drill was made, they then procured a title search to protect themselves from title defects and adverse claims. When the "Broughton problem" was discovered, Northwest notified Hatchers, and then proceeded to assume the risk of drilling and escrowed one-half the royalty. Equitable principles now preclude Northwest from extricating itself from this obvious risk-taking by belatedly relying on the Hatcher lease "warranty."

Thus, we rule that Hatchers are entitled to recover a one-eighth royalty from Northwest and the escrow account held in reserve because of the "Broughton interest" should be delivered to the Hatchers.

In so ruling, we place prime responsibility for this convoluted mess in the lap of Northwest, reject any opportunity to accord the Broughtons unjust enrichment and will award the Broughtons as a fair measure of their damages one-sixteenth of the royalties due plus accumulated interest arising from the escrowed funds. We make this award on the assumption that the amount currently in the escrow account contains one-half (i.e. one-sixteenth) of all

the royalties due under the Hatchers' lease from day one of production until the present time. On payment of said sum to the plaintiffs, said sum will represent total damages in the case due the plaintiffs, but so long as the wells remain in production Broughtons will continue to receive from Northwest a sum equivalent to one-half of the one-eighth royalties due Hatchers.

One other collateral matter must be resolved. Accordingly to the president of Northwest these wells were only moderately successful wells, and according to production and royalty figures it is obvious that the wells are in their declining years of production. The president of Northwest estimated the wells perhaps will be abandoned in the next two or three years, and the cost of plugging and abandoning the two wells is estimated at approximately $16,000. We do not feel Broughtons should pay any proportionate share of this cost and exonerate them from the responsibility of so doing.

## CONCLUSIONS OF LAW

(1) Broughtons are entitled to fair equitable compensation for their reserved interest. Said interest is a one-sixteenth interest in all royalties due.

(2) Hatchers are entitled to a one-eighth royalty and sums in an escrowed account representing one-sixteenth of payments due to Hatchers shall be paid to them.

(3) Northwest is not justified in relying on a title warranty in the Hatcher lease, as they were aware of the title defect before drilling and voluntarily assumed the risk.

(4) No party is entitled to payment for attorney fees or ancillary expert witnesss or administrative fees.

## DECREE NISI

(1) We find in favor of plaintiffs and award as damages the sum of $29,835.35, representing the amount held in an escrow account which represents a one-sixteenth of oil and gas royalties due (including accumulated interest theron) to the date of April 1, 1988, as reflected in supplemental answers to interrogatories.

(A) The above award will be augmented by any payments placed therein since April 1, 1988, and up until entry of a final decree.

(B) Upon entry of a final decree in this case, Northwest will continue to pay a sum equal to a one-sixteenth of the royalty due Hatchers direct to Broughtons.

(C) Broughtons shall not be responsible for "plugging fees" upon the wells ceasing to operate.

(2) We dismiss Northwest's defense of laches, the request for administrative fees in handling the escrow account, the counterclaim against Broughtons and all claims for counsel and expert fees.

(A) We dismiss Northwest's counterclaim against additional defendants Hatchers for any award of damages, counsel fees or interest.

(3) We sustain Hatchers' claim against Northwest and direct the money held in escrow representing one-sixteenth of royalties due and accumulated interest thereon to date of the final decree shall be paid to the Hatchers in proper proportionate shares. After a final decree all royalties due Hatchers will be paid directly to them.